PHILLIP A. TALBERT
United States Attorney
ROBERT L. VENEMAN-HUGHES
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> Vs. <br><br> JOSHUA KIMBALL, <br><br> Defendant. | CASE NO. 1:23-CR-00221-NODJ-BAM <br><br> **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO REVOKE DETENTION** <br><br> Date:   May 13, 2024 <br> Time:  9:00 AM <br> Judge: Hon. Jennifer L. Thurston |

Defendant Joshua Kimball moves this court to revoke the detention order issued on November 16, 2023 and the order denying defendant's motion for bail review ordered on December 7, 2023. The United States opposes this motion and requests the Court deny the motion. Kimball should remain detained as the government has presented a preponderance of the evidence that he is a flight risk and clear and convincing evidence that he is a danger to the community, and there are no conditions or combination of conditions that can assure his appearance in court or the safety of the community.

**I.      Bail Reform Act and Applicable Law**

The detention and release of a defendant is governed by the Bail Reform Act of 1984, 18 U.S.C.

United States' Opp. To
Detention Revocation Motion

1

§ 3141, et seq. Section 3145(b) of Title 18 permits a defendant to move for reconsideration of a detention decision, to be heard by the district court judge with original jurisdiction. The district court reviews the magistrate judge's decision de novo. *United States v. Koening*, 912 F.2d 1190, 1191 (9th Cir. 1990). While the district court is to give no deference to the magistrate's decision, the district court "is not required to start over ... and proceed as if the magistrate's decision and findings did not exist." *Id.* at 1193. Instead, the district court reviews "the evidence before the magistrate" and makes "its own independent determination whether the magistrate's findings are correct". *Id.* When necessary, the district court can conduct additional evidentiary hearings or consider additional evidence. *Id.*

When the government seeks detention, it bears the burden of proving by clear and convincing evidence that the defendant poses a danger to the community. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). In deciding whether the government has met its burden, the court must consider the factors provided in Section 3142(g) of Title 18 to make an "individualized" determination on the need for detention. *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006); *United States v. Hir*, 517 F.3d 1081, 1086, 1090–93 (9th Cir. 2008) (listing and then subsequently weighing the § 3142(g) factors to the individual case before the court); 18 U.S.C. § 3142(e) (noting that a judicial officer "shall order the detention" of the defendant if she "finds that no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community."). The 3142(g) factors are (1) the nature and circumstances of the offense charged, . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). Considering all four of these factors in this case, the government has shown that no condition or combination of conditions can be fashioned to ensure the safety of the community.

**II.     Analysis of 3142(g) factors**

    1. <u>**Nature and Circumstances of the Charged Offense**</u>

The defendant is charged with serious felonies, and the circumstances of those offenses are particularly concerning. As outlined in the complaint affidavit, ECF No. 1, Kimball was the architect of a firearms trafficking scheme linked at that time to at least 103 guns found in connection with crimes throughout California, Nevada, Arizona and Mexico[1]. Since the complaint was sworn, agents have uncovered additional evidence that the defendant's firearms trafficking scheme in Bakersfield through "Show Off Sports" was connected to and a continuation of his prior firearms trafficking scheme through a Missouri FFL and "American Warrior Enterprises."[2] The government believes these two businesses and federal firearms licenses are part of the same course of related and continuing conduct based on the location of firearms recovered, statements made by the defendant, and an analysis of firearms records. Between the Missouri FFL and Show Off Sports, there are approximately 900 guns unaccounted for that should be in the defendant's possession.

The seriousness of defendant's conduct, especially considering the circumstances of the charged offenses, supports detention in this case.

### 2. **Weight of the Evidence**

Although the Ninth Circuit has held that the weight of the evidence should be given the least amount of consideration, this court should still consider it "in terms of the likelihood that [the defendant] . . . will pose a danger." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). Here, the evidence against defendant is substantial.

In this case, defendant sold firearms as part of his illegal scheme to an undercover agent. He made statements both to the undercover agent and in interviews with agents prior to the service of the

---

[1] At the time of the filing of this motion, agents report that over 139 guns have now been traced to Kimball's firearms trafficking scheme.

[2] Defendant's Missouri FFL was connected to an organization called "American Warrior Enterprises" or AWE. Agents have determined that AWE operated as a similar illegal gun trafficking scheme or gun club as did Show Off Sports, LLC. The government proffers that Kimball shut down AWE when investigators in Missouri began to look into the operation, moving his operations to Show Off Sports LLC.

UNITED STATES' OPP. TO                            3
DETENTION REVOCATION MOTION

search warrant that show he knew the wrongfulness of his actions, telling the undercover agent how to conceal firearms transactions so that no one "points a finger at us", and then lying about the character of his business to agents prior to the service of warrants. Computer and other records recovered in the search warrant also provide evidence that this sale was not a one-off occurrence but the regular course of defendant's business, and multiple witnesses have given statements that the defendant sold them illegal firearms. Subsequent to his arrest, the government has had many of defendant's "gun club" members come forward to surrender their illegal firearms, providing further evidence of defendant's scheme. Finally, defendant has made inculpatory jail phone calls indicating that he had "a thought process for when this did happen." (Exh. 4, p. 2.)

### 3. The History and Characteristics of the Defendant

Defendant has a felony conviction for fraud in Kern County case BF139514A with a date of conviction on June 18, 2012.[3] According to court records, defendant took out eight insurance policies on a vehicle from eight different insurance companies, with seven of those policies obtained between December 20, 2007 and December 27, 2007. On December 31, 2007, Kimball reported to all the companies that his vehicle had been in an accident. Traffic collision reconstruction experts determined that the accident could not have occurred in the manner Kimball described. (Exh. 5.)

Defendant was also arrested for a felony related to brandishing in a road rage incident in Arizona in 2022. The case dismissed after a law enforcement agency failed to preserve a necessary piece of evidence.

Defendant has substantial out of state ties. He maintained a firearms business in Missouri until late 2021 (ECF No. 1 at 15) at an address the defendant continues to use as the registration address for

---

[3] Defendant had his conviction sealed and set aside in 2014 pursuant to Cal. P.C. 1203.4. Relief under this section is limited and does not affect firearm prohibitions or stop a prior conviction from being used to enhance a sentence. *United States v. Hayden*, 255 F.3d 768, 771-772 (9th Cir. 2001). Because of a clerical error on the part of the Kern County Superior Court, the 2012 felony was never entered into criminal databases and portions of the file were lost or destroyed. However, Kern County court records clearly show the date of conviction, the charge of conviction, and its final disposition.

his primary vehicle[4]. His primary vehicle is also registered in Missouri. Defendant indicated to ATF agents who interviewed him in 2021 in connection with that Missouri FFL that he was operating in Missouri at that time. Defendant told agents just prior to the service of the search warrant that he had formerly been involved with some sort of firearms business in Texas. He has been arrested in Arizona. At the time of his arrest, defendant's sole occupation was the operation of his illegal firearms scheme and the Show Off Sports firearms shop.

At the time of his arrest, the defendant claimed to have minimal assets to pre-trial services. However, he had approximately $80,000 in bank accounts and according to financial investigators they would have expected to locate an additional $100,000 in profits based on the number of observed transactions. However, those expected profits could not be found. (Exh. 3, p. 5:19-25.)

### 4. Nature And Seriousness of the Danger Posed by the Defendant's Release

The defendant poses a serious danger to the community through his distribution of illegal firearms, especially given the reserve of unaccounted-for firearms and his statements that he has a "contingency plan" should he be arrested. At the time of this motion, over 900 guns remain unaccounted for that should be in defendant's possession and that he acquired via his firearms trafficking operation.

Approximately 700 guns were unaccounted for when defendant closed his Missouri FFL. At least 139[5] of those guns have been recovered in connection with crimes in California and nearby states, centered around Bakersfield, Calif. Of those recoveries, significant clusters of guns have been located connected to members of the Bulldogs criminal street gang in Fresno, the Norteno criminal street gang in Bakersfield, and Armenian drug traffickers in Los Angeles County. Roughly 550 guns are still unaccounted for.

Over 100 guns were seized by agents during the service of search warrants in this case, including

---

[4] Significantly, the defendant did not disclose the existence of this out-of-state vehicle to pre-trial services when interviewed prior to his first detention hearing. (Exh. 1, p. 6:21-7:9.)

[5] Based on recovery data from e-Trace, the ATF's national clearinghouse for recovered crime guns. Not all guns recovered from crime scenes are entered into e-Trace, and so the 139 gun figure represents a minimum number of recovered crime guns.

over ten silencers and at least two fully automatic machine guns. Short-barrel rifles and shotguns were also seized in connection with this case. Another 185 firearms have been surrendered to law enforcement by purchasers in Kimball's illegal gun trafficking network. Approximately 400 firearms remain unaccounted for from Show-Off Sports.[6] At the time of the search warrant, defendant additionally indicated to agents in an interview that between 200 and 400 guns belonging to Show Off Sports had been "loaned" to others.

The volume of defendant's unaccounted-for firearms is particularly concerning in light of his obstruction of justice conduct and plans. He told undercover agents to call him prior to speaking to police about the guns he sold, which the government proffers was an attempt to coordinate stories in case of law enforcement discovery. He additionally instructed undercover agents in how to conduct illegal firearms transactions so that no one could "point the finger at all of us." When agents informed defendant he was under arrest at the conclusion of their interview, he lunged away from agents and attempted to shut down and lock his laptop so they could not seize his records.

Defendant finally told agents, both undercover and identified, that he had multiple unknown business partners in his operation. This raises particular concern for the government in light of his November 5, 2023 jail call where he told his girlfriend that "there's a contingency plan. It's a lot of work, but it'll work out" and "if it all works out, lets just say the kids technically won't ever have to work again for the rest of their lives." (Exh. 4, p. 2.) Indeed, defendant in jail calls has discussed that he has been engaged in gun trafficking for years, and that he knew he would eventually be caught but "bad news is always good publicity." (Exh. 1, p. 16:8-15; ECF No. 12, p. 6: 3-5.)

### III. Defendant's Proffered Conditions Are Insufficient

---

[6] According to agents, Kimball's record-keeping at Show-Off Sports was abysmal. ATF recorded 465 unaccounted-for firearms as of February 7, 2024. Since February 7, 2024, an additional 54 firearms have been recovered, however because of the poor quality of the record-keeping it's unknown how many of those 54 firearms are part of the missing 465. In this motion, the government is erring on the side of caution and assigning all of those recovered firearms to the "balance", but in fact because of the state of defendant's records they may be more unaccounted-for firearms than the government has been able to identify.

Kimball proffers a cash bond, third-party custodian, location monitoring, and search waiver as conditions to insure his appearance and the safety of the community. None are sufficient.

One specific, individualized danger that Kimball presents is his ability to use the telephone or other communication methods to dispose of illegal firearms and continue his gun trafficking operations. Kimball used electronic methods, including Instagram, to recruit buyers, including the undercover agent in this case.

Electronic monitoring does not prevent Kimball from coordinating the sale and transfer of weapons electronically or through meetings in innocuous locations. Only the risk of detection – by his calls being monitored as they are in custody – can mitigate that risk.

Similarly, a third-party custodian is not someone who can prevent Kimball from the kind of dangerous communications at risk in this case. Such a person cannot be with him twenty-four hours a day, reading every text message and listening to every call. If Kimball's dangerousness was in the form of some ongoing enterprise that could easily be detected, like running a drug lab, perhaps a custodian could stop that from occurring. Instead, Kimball's dangerousness arises from his long experience running a gun trafficking operation; this is dangerousness through networking and communication, which are not risks a third-party custodian can mitigate. The proffered third party custodian in question, David Jansen, has also not been evaluated by pre-trial services, nor is it clear that Kimball would reside with that custodian were he released.[7]

Defendant also offers a cash bond in the form of his truck; however, as discussed above, a $5000 cash bond secured by the sale of his vehicle does not provide significant surety when the defendant has a second, unreported vehicle and when there are substantial missing financial assets.

Conditions or combinations of conditions can only ensure community safety when the defendant can be trusted to comply with them. *See Hir*, 517 F.3d at 1092 (affirming detention order despite a laundry list of stringent conditions proposed by Pretrial Services because "in order to be effective"

---

[7] This is particularly significant given Kimball's history of serially recruiting potential third-party custodians under suspicious circumstances. This is the third third-party custodian proposed to the court; in attempts to recruit prior third-party custodians, Kimball has told custodians that he only needs to stay with them a short time while he makes "alternative arrangements", which gives rise to a risk of flight. (Exh. 2, p. 12:10-21.)

UNITED STATES' OPP. TO
DETENTION REVOCATION MOTION 7

conditions "depend on [the defendant's] good faith compliance").  Here, the conditions are only as good as the defendant's compliance, and he has shown in this case his intent to avoid compliance via a contingency plan.

No condition or combination of conditions can ensure public safety or the defendant's continued appearance.

**IV.   Conclusion**

Taken as a whole, a preponderance of the evidence shows a risk of flight and clear and convincing evidence demonstrates the danger to the community if Kimball is released. By his own admission, he has been planning for the government to catch up with his firearms trafficking scheme, and he has made contingency plans against that day. He has approximately 1000 firearms unaccounted for, ties to other states, an out of state car he neglected to disclose to pre-trial services and perhaps $100,000 in expected profits from firearms trafficking the government hasn't located.  The government respectfully request's defendant's motion be denied.

PHILLIP A. TALBERT
United States Attorney

Date: April 30, 2024            By:     /s/ Robert L. Veneman-Hughes
                                        ROBERT L. VENEMAN-HUGHES
                                        Assistant United States Attorney